[Cite as *In re C.L.M.*, 2013-Ohio-4044.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

---

JOURNAL ENTRY AND OPINION
**No. 99622**

---

## IN RE: C.L.M.
## A Minor Child

## [Appeal by Cuyahoga County Department of Children and Family Services]

---

**JUDGMENT:**
REVERSED, VACATED, AND REMANDED

---

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. DL-11118577

**BEFORE:** Rocco, J., Boyle, P.J., and E.A. Gallagher, J.

**RELEASED AND JOURNALIZED:** September 19, 2013

-i-

**ATTORNEYS FOR APPELLANT**

Timothy J. McGinty
Cuyahoga County Prosecutor

By: Cheryl Rice
Assistant County Prosecutor
Justice Center
1200 Ontario Street
Cleveland, Ohio 44113

**ATTORNEYS FOR APPELLEES**

**For C.L.M.**

Robert L. Tobik
Cuyahoga County Public Defender
By:   Ashley Christine Nikithser
Assistant Public Defender
1849 Prospect Avenue
Suite 222
Cleveland, Ohio 44115

**For Kenneth Davis**

Kenneth Davis
Inmate No. 522-239
Marion Correctional Institution
P.O. Box 57
Marion, Ohio 43302

**Guardian Ad Litem**

Gregory T. Stralka
6509 Brecksville Road
P.O. Box 31776
Independence, Ohio 44131

**For Maria Kawentel**

Maria Kawentel
ODYS
615 Superior Avenue, #860
Cleveland, Ohio 44113

**For T.B.M.**

T.B.M.
7841 Garden Valley Avenue
Cleveland, Ohio 44104

KENNETH A. ROCCO, J.:

{¶1} Appellant Cuyahoga County Department of Children and Family Services ("CCDCFS") appeals from an order committing juvenile, C.L.M., to the emergency custody of CCDCFS. Because the magistrate lacked the authority to issue the order, we reverse and vacate the order, and we remand the case to the trial court.

{¶2} This is the second time that this case has come before our court. *See In re C.L.M.*, 8th Dist. Cuyahoga No. 97980, 2012-Ohio-5175 ("*C.L.M. I*"). On January 19, 2012, C.L.M. was adjudicated delinquent for the attempted rape of his three-year-old neighbor. C.L.M. was 14 years old at the time of the offense. The juvenile court committed C.L.M. to an Ohio Department of Youth Services ("ODYS") secure facility for a minimum period of one year and a maximum period until C.L.M.'s 21st birthday. C.L.M. was classified as a tier II sex offender.[1]

{¶3} After serving the minimum amount of time at an ODYS secure facility (which included credit for time in detention), C.L.M. was released on supervised release on November 7, 2012.[2] C.L.M. was placed on the re-entry court docket.[3] C.L.M. was

---

[1] In *C.L.M. I*, we held that the trial court erred in making the sex-offender classification at the disposition hearing, and that such a classification cannot be made except upon a delinquent's release from an ODYS secure facility. *Id.* at ¶ 2. We reversed the trial court's final judgment only insofar as it classified C.L.M. as a tier II sex offender. The record indicates that, upon C.L.M.'s release from the ODYS secure facility, the juvenile court conducted a hearing and once again classified C.L.M. as a tier II sex offender.

[2] We are troubled by the fact that, at the time that ODYS placed C.L.M. on supervised release, C.L.M. had yet to complete sex-offender programming. In spite of this fact, and in spite of the fact

placed at Claudia's Family Development Group Home ("Claudia's Home"). ODYS maintained legal custody of C.L.M. while he was on supervised release.

{¶4} C.L.M. appeared before the re-entry court on November 19, 2012, where the court approved an ODYS unified case plan outlining C.L.M.'s integration back into the community. As part of his ODYS unified case plan, C.L.M. was enrolled in the Cleveland Public Schools and in an intensive outpatient drug-treatment program.

{¶5} But within three weeks of his release from the ODYS secure facility, C.L.M.'s parole officer filed a complaint for violating conditions of his supervised release and requested a warrant to hold C.L.M. in a detention center ("the complaint"). The complaint set forth that: (1) on November 26, 2012, C.L.M. left the drug-treatment program without permission; (2) on that same day, he refused to take his psychotropic medication; (3) on November 28, 2012, C.L.M. was suspended from school for three days following a verbal confrontation with school security staff; and (4) on that same day C.L.M. caused significant property damage at Claudia's Home and required physical restraint by staff. According to the complaint, following the incident at Claudia's Home, C.L.M. was transported by police to the psychiatric unit at Rainbow Babies and Children's Hospital. He was then transported to a detention center. The complaint

---

that C.L.M. had "trashed" the computer lab at the state institution, the ODYS unified case plan rated C.L.M. as a low risk in six of seven categories.

[3]The re-entry court is a specialized docket designed to address the needs of youth who are at high risk for further delinquent activity and who are returning to the community from ODYS institutions. Cuyahoga County Juvenile Division 2011 Annual Report, available at http://juvenile.cuyahogacounty.us/annual_report/pdf/2011_Annual Report.pdf.

alleged that C.L.M.'s conduct violated three different conditions of his supervised release.

At C.L.M.'s arraignment, on November 29, 2012, nine deputies were required to remove

C.L.M. from the courtroom and to move him back into the detention center.

**{¶6}** On December 17, 2012, the re-entry court conducted a hearing on the

complaint and found that C.L.M. had violated the conditions of his supervised release.

At the hearing, C.L.M.'s ODYS parole officer stated:

> Because of [the] complex nature of all of his diagnoses, his mental health diagnoses, substance abuse diagnoses and his behavior problems * * * I'm of the contention that [C.L.M.] is going to need a long-term residential treatment facility that we currently do not have.
> * * *
> Because of th[ese] extraordinary set of circumstances and [C.L.M.'s] very special needs * * * I believe it is most prudent for the [CCDCFS] to be called in and join us and share custody of [C.L.M.] so that we can jointly proceed to find the best alternative placement for him other than a corrections facility.

Tr. 9-10.

**{¶7}** At the hearing's conclusion, the magistrate stated that she would refer the

case to CCDCFS with the intent to eventually grant emergency custody to CCDCFS.

The magistrate set a new hearing for January 2013, and indicated that she would ask

CCDCFS for a report. The magistrate stated, "If [CCDCFS] thinks it's okay for you to

go home, if I get that information prior to your court date, I may consider releasing you on

a monitor to reside with your mom until we come back for the next court hearing."[4]   Tr.

---

[4]We are surprised that the magistrate would consider sending C.L.M. home to stay with his mother in light of all that had occurred in the short time since C.L.M. had been on supervised release.

15. In the meantime, C.L.M. continued to reside at the detention center and was still in the legal custody of ODYS.

{¶8} On January 28, 2012, the re-entry court conducted a hearing to determine C.L.M.'s disposition for violating the conditions of his supervised release and to hear from CCDCFS. Because the magistrate had yet to receive a psychological evaluation, she continued the disposition matter until the next hearing. A CCDCFS representative spoke at the hearing and indicated that, because C.L.M.'s mother was actively involved in C.L.M.'s life, he was not at risk for abuse or neglect in his home. But if C.L.M. could not be safely maintained in the community, CCDCFS hoped that the court would consider placement. According to the CCDCFS representative, the agency had entered into preliminary discussions to possibly have C.L.M. placed at a secure residential treatment center for youth with behavioral health needs.[5] The magistrate decided to hold in abeyance whether to grant emergency custody to CCDCFS. C.L.M. remained in the detention center pending the next hearing.

{¶9} On February 11, 2013, the re-entry court held its next hearing. At this point, C.L.M. had undergone a full psychological examination and the magistrate was in receipt of the psychological and neuropsychological evaluations. The reports indicated that it would be dangerous to release C.L.M. into the community, and that C.L.M. should be maintained in a secure residential setting. According to C.L.M.'s parole officer, ODYS was unable to locate a facility prepared to handle his specific needs, and so the parole

---

[5]The facility was not an ODYS facility.

officer recommended that the court grant emergency custody to CCDCFS. C.L.M.'s mother also spoke at the hearing and indicated that she could not safely maintain C.L.M. in the home. A representative from CCDCFS also appeared at the hearing and indicated that CCDCFS had contacted every agency with which it had a contract and that there was no agency that would accept C.L.M. The agencies that CCDCFS had contracts with were concerned with the reports indicating that C.L.M. was homicidal and with the fact that he was not stabilized on his psychotropic medications because he had been selling them at the detention center.

{¶10} After considering the psychological and neuropsychological reports and hearing from ODYS, CCDCFS, and C.L.M.'s mother, the magistrate then turned to the issue of how to proceed on C.L.M.'s supervised-release violations. According to the magistrate, at most, C.L.M. could be committed to 90 days at an ODYS secure facility for violating the conditions of his supervised release. But because C.L.M. was entitled to credit for the time he had stayed in the detention center since the end of November, the magistrate concluded that she could send C.L.M. to an ODYS secure facility for only two weeks.

{¶11} Over CCDCFS's objection, the magistrate then issued an order granting emergency custody to CCDCFS. The magistrate's order found that C.L.M. has homicidal ideations, and that, although he posed a threat to himself and to the community, he had committed no new offense whereby he could be committed to an ODYS secure facility. In spite of the fact that CCDCFS had already indicated that it was unable to find

a placement for C.L.M., the magistrate's order stated that "CCDCFS is hereby ordered to obtain a placement for [C.L.M.] on or before the next hearing." The order was filed on February 13, 2013, and is the subject of this appeal.[6]

{¶12} On March 8, 2013, CCDCFS filed its notice of appeal from the magistrate's order granting emergency custody to CCDCFS.[7] No appellee brief was filed for our consideration. On appeal, CCDCFS asserts that the order was against the manifest weight of the evidence, and that the magistrate erred in concluding that C.L.M. could not be committed to an ODYS secure facility.

{¶13} We first set forth why the order granting emergency custody is final and appealable under R.C. 2505.02. Appellate courts "have such jurisdiction as may be provided by law to review and affirm, modify, or reverse judgments or final orders of the courts of record inferior to the court of appeals within the district[.]" Ohio Constitution, Article IV, Section 3(B)(2). If a court's order is not final and appealable, we lack

---

[6]In conformance with Juv.R. 40(D)(2)(b), CCDCFS filed a motion to set aside the order. The trial court denied the motion on March 4, 2013.

[7]On March 11, 2013, the re-entry court magistrate conducted another hearing to entertain CCDCFS's motion for a continuance. At the hearing, CCDCFS indicated that it had not found any agency to accept C.L.M., and asserted that CCDCFS was legally precluded from placing C.L.M. in a secure facility. CCDCFS further indicated that it had no intent to file a complaint for abuse, neglect, or dependency. The magistrate indicated that C.L.M. would have to remain in the detention center for safety reasons and determined that C.L.M.'s participation in the re-entry court program would terminate because "[i]t's just become a little too involved for re-entry court." Tr. 7. According to the magistrate, any further proceedings would go before the judge. It is unclear from the record where C.L.M. resides at the present time.

jurisdiction to review the matter and we must dismiss the appeal. *In re S.M.B.*, 8th Dist. Cuyahoga No. 99035, 2013-Ohio-1801, ¶ 4.

**{¶14}** R.C. 2505.02(B)(2) provides that an order is final and appealable if it "affects a substantial right made in a special proceeding or upon a summary application in an action after judgment." "Substantial right" includes "a right that * * * a statute * * * entitles a person to enforce or protect." R.C. 2505.02(A)(1). A "special proceeding" is "an action or proceeding that is specially created by statute and that prior to 1853 was not denoted as an action at law or a suit in equity." R.C. 2505.02(A)(2).

**{¶15}** Juvenile court proceedings are special proceedings. *State ex rel. Fowler v. Smith*, 68 Ohio St.3d 357, 360, 626 N.E.2d 950 (1994). *See also In re C.B.*, 129 Ohio St.3d 231, 2011-Ohio-2899, 951 N.E.2d 398, ¶ 12 ("[C]ustody hearings are special proceedings"). It follows, then, that if the emergency custody order affects a "substantial right," the order is final and appealable.

**{¶16}** We conclude that the emergency custody order in this case does affect a substantial right. In an instructive case, the Ohio Supreme Court concluded that a substantial right was affected in a permanent-custody proceeding when a guardian ad litem had a statutory obligation to ensure that the child's best interests were enforced and protected. *In re C.B.*, 129 Ohio St.3d 231, 2011-Ohio-2899, 951 N.E.2d 398, ¶ 14.

**{¶17}** Similarly, in the instant case, once the court ordered CCDCFS to assume custody, CCDCFS assumed statutory obligations to act in the child's best interest. *See* R.C. 5153.16(A)(7) (CCDCFS is required to "[a]ccept custody of children committed to

the public children services agency by a court exercising juvenile jurisdiction."); R.C. 5153.16(A)(4) (mandating that CCDCFS provide a level of care that the agency considers to be in the best interest of the child). The emergency custody order required CCDCFS to take on the parental role of providing for C.L.M.'s basic needs (food, clothing, shelter), his educational needs, and his medical and psychological needs. In short, the order imposed custody on CCDCFS where no custody previously existed, and required CCDCFS to fulfill a multitude of statutory obligations, which included finding an appropriate placement for a tier II sex offender, who expresses homicidal ideations. For these reasons, we conclude that a substantial right is affected in this case. Because the emergency custody order affects a substantial right made in a special proceeding, the order is final and appealable under R.C. 2505.02(B)(2).

{¶18} Having determined that we can review the order under R.C. 2505.02(B)(2), we conclude that the magistrate lacked the authority to grant emergency custody to CCDCFS. The Rules of Juvenile Procedure distinguish between a magistrate's "order" and a magistrate's "decision." Juv.R. 40(D)(2), (3). While a magistrate's decision is not effective until adopted by the trial court, a magistrate's order does not require judicial approval.[8] *In Re: H.R.K.*, 8th Dist. Cuyahoga No. 97780, 2012-Ohio-4054, ¶ 8-9, citing Juv.R. 40(D). A magistrate may enter orders without judicial approval "if necessary to regulate the proceedings and if not dispositive of a claim or defense of a party." Juv.R.

---

[8]A party may, however, file a motion with the trial court to set aside the magistrate's order. Juv.R. 40(D)(2)(b).

40(D)(2)(a)(i).   In other words, "a magistrate's ability to issue 'orders' is limited to regulatory, non-dispositive orders."   *In Re: H.R.K.*, ¶8.

{¶19} A magistrate may issue a temporary custody order pending the outcome of a delinquency adjudication.   *See* Juv.R. 40(D)(2)(a)(iii)(D) (authorizing magistrates to issue custody orders pursuant to Juv.R. 6); *State ex rel. Kanaga v. Lawson*, 11th Dist. Lake No. 2009-L-106, 2010-Ohio-321, ¶ 20-22 (concluding that the magistrate had the authority to issue a temporary custody order in the midst of trial so as to protect the child's interests until the trial court could issue a final judgment in the underlying custody dispute).

{¶20}   But unlike temporary emergency orders that transfer custody pending the outcome of a trial court ruling, the order in the instant case had the effect of indefinitely transferring custody from ODYS to CCDCFS.   The order was not labeled as temporary, and there was no indication in the order that the transfer of custody was pending a future decision by the trial court.   We conclude that the order was dispositive and so the magistrate did not have the authority to issue the order.[9]

{¶21} Furthermore, the order was not necessary to regulate the proceeding.   The proceeding in this case was a disposition hearing related to C.L.M. violating the conditions of his supervised release.   An order transferring custody from ODYS to CCDCFS was not necessary to regulate such a proceeding.   If anything, the order

---

[9]We recognize that the language of Juv.R. 40(D)(2)(a)(i) is "not dispositive of a *claim or defense*."   In the context of a post-adjudication proceeding, such as the one in this case, "claim or defense" includes matters relating to who maintains custody of the child.

appears to undermine the disposition proceeding. In our view, ODYS, not CCDCFS, is the appropriate entity to address the placement needs of a youth who was adjudicated delinquent, classified as a sex offender, placed on supervised release, and then violated the conditions of his supervised release. It is painfully clear from the record that C.L.M. is in need of long-term, specialized services in a secure facility. Of the three agencies involved (ODYS, the juvenile court, and CCDCFS), only ODYS maintains long-term, secure facilities. Furthermore, of the three agencies, ODYS has the largest pot of money from which to pay for the type of specialized services that are required in this case. In requesting that the magistrate transfer custody to CCDCFS, ODYS abdicated its statutory responsibilities, essentially treating C.L.M. like a hot potato, because his case was "complex" and "extraordinary."[10]

{¶22} For these same reasons, we conclude that even if the magistrate did have the authority to issue the emergency custody order, it erred in granting custody to CCDCFS. Like ODYS, CCDCFS had already indicated to the magistrate that it did not have any placement options available for C.L.M. As the state department responsible for the juvenile corrections system, ODYS is clearly in the best position to place a youth, who has violated the conditions of his supervised release, into a secure residential facility.

---

[10]As we see it, ODYS first failed C.L.M. and the community at large when it released him from the secure facility after serving only the minimum amount of time on his sentence for attempting to rape a three-year old. At the time that C.L.M. was placed on supervised release, he had not even completed sex-offender programming. In light of these facts, and in light of C.L.M.'s myriad psychological, substance abuse, and behavioral problems, it does not take much foresight to predict that C.L.M. was extremely unlikely to succeed on supervised release.

*See* R.C. Chapter 5139.   In contrast, CCDCFS's mission is to protect children at risk of abuse and neglect.   *See* Ohio Adm.Code 5101-2.   There has been no finding in this case that C.L.M. is abused or neglected.   As C.L.M. needs the services of a secure residential facility, we fail to see how this end is best served by transferring custody away from an entity that specializes in placing youth in secure facilities and granting custody to an entity that lacks the expertise or resources to effectuate such a placement.

{¶23} Finally, the perceived bind that the magistrate found herself in regarding C.L.M.'s disposition and placement was based on a misapplication of the law.   The magistrate placed C.L.M. in CCDCFS custody because ODYS had represented that it had exhausted all placement options and because C.L.M. had committed no new offenses whereby the magistrate could commit him to an ODYS secure facility.   Contrary to what the magistrate believed, C.L.M. was eligible for placement in an ODYS secure facility for violating the conditions of his supervised release.

{¶24} Although Ohio law permits ODYS to release a youth from an ODYS secure facility at any time after the minimum period specified by the court ends, the youth is then subject to ODYS supervised release.   R.C. 5139.52(F) governs the violation of supervised release and provides, in pertinent part:

> If the court * * * determines at the hearing that the child violated one or more of the terms and conditions of the child's supervised release, the court, * * * may revoke the child's supervised release and order the child to be returned to the department of youth services for institutionalization or, in any case, may make any other disposition of the child authorized by law that the court considers proper.   If the court orders the child to be returned to a department of youth services institution, the child shall remain institutionalized for a minimum period of thirty days * * *.   [T]he release

authority, in its discretion, may require the child to remain in institutionalization for longer than the minimum thirty-day period, and the child is not eligible for judicial release or early release during the minimum thirty-day period of institutionalization or any period of institutionalization in excess of the minimum thirty-day period.

{¶25} In the instant case, the magistrate concluded that the maximum period of re-commitment for C.L.M. violating the conditions of his supervised release was 90 days. Although we are not certain how the magistrate arrived at 90 days, we presume that she arrived at this number because the statute references 30 days and C.L.M. had violated three different conditions of his supervised release. According to the magistrate, C.L.M. was entitled to credit for the time he had stayed in the detention center since the end of November, which meant that only two weeks remained on the potential 90-day re-commitment.[11]

{¶26} But our case law makes clear that R.C. 5139.52(F) "does not provide that a child may only be institutionalized for 30 days; rather, it states that the child must be given a *minimum* commitment of 30 days." (Emphasis added.) *In Re D.B.*, 8th Dist. Cuyahoga No. 97445, 2012-Ohio-2505, ¶ 18. Furthermore, the statute empowers the court to "make any other disposition of the child authorized by law that the court considers proper." R.C. 5139.52(F). The "[u]se of the word 'any' means that the trial

---

[11] It appears that the magistrate erred in making this calculation. The statute provides that the minimum 30-day period should not be reduced "for any time that the child was held in secure custody subsequent to the child's arrest and pending the revocation hearing and the child's return to the department." R.C. 5139.52(F). But the magistrate's time-reduction calculation appears to be based on the date upon which C.L.M. was arrested.

court ha[s] discretion to take 'any steps the court believe[s] necessary to fully and completely implement the rehabilitative disposition of the child * * * ." *In Re D.B.*, ¶ 18.

**{¶27}** Applying R.C. 5139.52(F) and our decision in *In Re D.B.* to the facts of this case, we conclude that C.L.M. could have been re-committed to the institutional care of an ODYS secure facility for violating the conditions of his supervised release.[12] All involved agreed that C.L.M. needed a secure placement, and an ODYS secure facility appeared to be the only secure placement option available.

**{¶28}** We reverse and vacate the order. Accordingly, custody reverts back to ODYS. On remand, the trial court is instructed to hold further proceedings consistent with this opinion.

It is ordered that appellant recover from appellee costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
KENNETH A. ROCCO, JUDGE

_____

[12]   We recognize that the Ohio Supreme Court has recently certified a conflict on the issue of whether a trial court may order a child returned to ODYS for more than a minimum period of 30 days pursuant to R.C. 5139.52(F).   *In re L.L.B.*, 134 Ohio St.3d 1446, 2013-Ohio-347, 982 N.E.2d 726.

MARY J. BOYLE, P.J., and
EILEEN A. GALLAGHER, J., CONCUR